**BOY SCOUTS OF AMERICA, and Connecticut Rivers Council, Boy Scouts of America, Plaintiffs**

**v.**

**Nancy WYMAN, in her capacity as Comptroller of the State of Connecticut and as a member of the Connecticut State Employee Campaign Committee; Carol Carney in her capacity as Chair of the Connecticut State Employee Campaign Committee; and Margaret Diachenko, Richard Emonds, Paluel Flagg, Christine Fortunato, Burton Gold, Carol Guiliano, Carol Hamilton, Marilyn Kaika, Joan Kelly–Coyle, D'Ann Mazzocca, Ber-**

---

160

nard McLoughlin, Michael Nichols, William Philie, Cheryl Sawina, and Noel Thomas in their capacities as members of the Connecticut State Employee Campaign Committee, Defendants

No. 3:00CV1047 (WWE).

United States District Court,
D. Connecticut.

July 23, 2002.

Daniel Schwartz, Day, Berry & Howard, Stamford, CT, George A. Davidson, Seth D. Rothman, Randi B. Rivner, Hughes, Hubbard & Reed, New York City, for Plaintiffs.

William J. Prensky, Attorney's General's office, Philip A. Murphy, Jr., Cammie J. Parker, Commission On Human Rights & Opportunities, Hartford, CT, for Defendants.

Maureen M. Murphy, Murphy, Ferrara & Nugent LLC, New Haven, CT, Jennifer Levi, Gay & Lesbian Advocates & Defenders, Boston, MA, for Movants.

### *RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT*

EGINTON, Senior District Judge.

This action arises from a declaratory ruling requested by the Connecticut State Employees Campaign Committee ("Committee"), and issued by the Connecticut Commission on Human Rights and Opportunities ("CHRO"), regarding whether the Committee must permit the Boy Scouts of America, and Connecticut Rivers Council, Boy Scouts of America, collectively a private organization that may legally discriminate on the basis of sexual orientation ("BSA"), the opportunity to participate in the state's workplace charitable campaigns. The CHRO issued its declaratory ruling to the Committee, to the effect that the state would be in violation of Connecticut's Gay Rights Law if the Committee were to retain the BSA in its campaign. The BSA initiated this litigation to enjoin the Committee from excluding it from the

Year 2000 Campaign and future campaigns, and to ensure its receipt of state donations already directed to it in the 1999 state campaign.

The BSA alleges that the defendants have violated its rights of freedom of speech and freedom of association protected by the First and Fourteenth Amendments to the United States Constitution, under 42 U.S.C. § 1983 (Count 1); violated its rights under § 5–262–3(k) of the Regulations of Connecticut State Agencies by disallowing the BSA to participate in the Campaign without a decision by the CHRO on whether the Boy Scout membership policies violate a Connecticut anti-discrimination statute (Count 2); violated its rights under Conn. Gen.Stat. § 46a–81r by "condoning homosexuality," and "requiring the teaching in educational institutions of homosexuality as an acceptable lifestyle" (Count 3); and violated its rights under Conn. Gen.Stat. § 46a–81a by discriminating against the BSA for showing a "preference for heterosexuality," and penalizing the BSA for excluding open homosexuals from leadership positions (Count IV).

Pending before this Court are cross-motions for summary judgement by the BSA; by Nancy Wyman, et al. (collectively referred to as defendant "Committee"); and by the CHRO, as intervenor-defendant. For the reasons set forth below, the Boy Scout's motion for summary judgment will be denied. The motions for summary judgment of the Committee and of the CHRO will be granted.

### FACTS

The Connecticut legislature has sanctioned an annual workplace campaign ("Campaign") to raise funds from state employees for charitable and public health, welfare, environmental, conservation, and service purposes. The Campaign is administered by a State Employee Campaign Committee established by law. The Committee members are determined by statute and include: the State Comptroller or her designee; the Commissioner of Administrative Services, or his designee; the Executive Director of the Joint Committee on Legislative Management or his designee; ten state employees; and two retired state employees. The statute also provides for nonvoting members who represent each participating federation in the Campaign. All parties concur that the Committee is a state actor.

The Campaign is a workplace solicitation of state employees that is conducted during working hours using non-coercive methods that permit voluntary giving, and reserve to the individual the right to disclose any gift or to keep it confidential. The Campaign is conducted from September to November each year. Committee members who are current state employees continue to be paid their state salaries while they work on the Campaign during normal business hours. State employees make their voluntary contributions from the list of participating organizations set forth in the Campaign booklet entitled "Directory of Charitable Organizations" which is distributed at the workplace. The BSA was listed in the Directory for the 1999 and 2000 campaigns.

State employees make their voluntary gifts by payroll deduction. Any state officer or employee wishing to make a voluntary campaign donation must make a written request to the Comptroller to permit a payroll deduction for his or her donation from such officer's or employee's wages or salary. The amount deducted is collected by the Comptroller and transmitted to the principal combined fund-raising organization, usually a United Way, that administers the campaign for the state.

Organizations can participate in the Campaign by submitting an application in the form prescribed by the Comptroller to the Committee on or before January 15

annually. The application requires applicants to provide various specific information to establish eligibility for participation in the campaign. The required Campaign documentation that is particularly relevant to this litigation reads, in pertinent part, as follows:

> a document signed by an officer or the executive director of a federation, certifying ... that the federation maintains on file the following documents for itself and for each member agency ...: (vii) a written policy of non-discrimination.

Member organizations of participating federations file their Campaign applications with their parent federations where such applications are thereafter maintained. The parent federation files an application with the Committee attesting to its member organizations' compliance with all of the Committee's requirements. The Committee, acting through a subcommittee designated as the application review committee, reviews all applications for completeness and for compliance with eligibility standards. The Committee's regulations also provide for the removal of a federation or one of its member agencies from a campaign, if that federation or member agency fails to adhere to the eligibility requirements or the policies and procedures of the Campaign. If a member agency's eligibility to participate in the Campaign is withdrawn by the Committee, the federation may not distribute any funds raised in the Campaign to such agency.

The plaintiff Connecticut Rivers Council, Boy Scouts of America, is a private, nonprofit organization chartered by the Boy Scouts of America to support scouting in the Connecticut counties of Litchfield, Hartford, Windham, New London, and Middlesex. Connecticut Rivers Council and three other Connecticut councils are member agencies of local chapters of the United Way in Connecticut. The Connect-

icut councils of the BSA applied to the Committee to participate in the Campaign. In those applications, the BSA affirmatively answered that it had a written policy of nondiscrimination. In 1999, all four Boy Scout councils received donations from the Campaign directly earmarked for them by individual donors, and upon application to their local United Way, received funds from the pool of donated funds received by the United Way chapters in Connecticut.

Although the BSA certified to the Committee that it did not discriminate, the BSA adopted a position, memorialized in its writings as long as ten years ago, that is allegedly inconsistent with Connecticut's nondiscrimination policy based upon sexual orientation. On October 6, 1999, the Committee received an unsolicited letter from the Executive Director of the CHRO, Cynthia Watts–Elder, pointing out that by allowing the BSA to participate in the Campaign and to benefit from a fundraiser that uses state resources, the Committee potentially makes the state a party to discrimination. The impetus for the letter was the New Jersey Supreme Court decision in *Dale v. Boy Scouts of America*, 160 N.J. 562, 734 A.2d 1196 (1999). The Executive Director wrote that "recently, a court decision has decided that it is discriminatory for the Boy Scouts of America to expel an Assistant Scoutmaster who publicly declared that he was gay."

In reaction to the October 6, 1999, letter from the CHRO, the Committee sought an immediate clarification from the BSA. In response to that query, the Committee received a letter from Scout Executive Harry Pokorny of the plaintiff Connecticut Rivers Council, BSA, expressing the BSA's national position on homosexuality, which clearly stated that the BSA cannot register homosexuals. Because of the apparent conflict between the Boy Scout's attestation in its application of having a nondiscri-

mination policy in place, the October letter pronouncing the national position of the BSA on homosexuality, and the New Jersey Supreme Court decision, the Committee became concerned that it might be violating Connecticut statutes that proscribe the state from furthering discrimination that is prohibited by law. The Committee presented the CHRO with a petition for a declaratory ruling on the matter.

The CHRO sought and received information from the Committee, the BSA, and other interested parties in the course of the declaratory rulings proceedings. On April 27, 2000, the CHRO conducted a fact-finding hearing to assist it in rendering its decision.

The Committee's petition for declaratory ruling, dated November 19, 1999, asked the following two questions:

1. Does the BSA's and/or its local councils' policy or policies on sexual discrimination violate any state anti-discrimination statute or regulation over which your agency has any oversight or jurisdiction?

2. Is the Committee's inclusion of BSA member agencies in the State Employee Campaign in violation of any state law over which your agency has oversight or jurisdiction, including but not limited to Conn. Gen.Stat. Sections 46a–81(d), 46a–81l and 46a–81n?

The CHRO issued its first declaratory ruling on May 12, 2000, answering only the second question. The CHRO found that the state would be in violation of the enumerated statutes of the Gay Rights Law if it were to retain the BSA in its Campaign. Acting in accordance with the declaratory ruling, the Committee notified the various United Way federations that their member Boy Scout Councils would not be able to participate in the upcoming Year 2000 Campaign. On July 31, 2000, the Committee excluded twenty nine other organizations from participating in the 2000 campaign for failure to comply with the Committee's non-discrimination requirement.

The present action was commenced on June 7, 2000, by the BSA filing a motion for temporary restraining order and preliminary injunction. The BSA sought to enjoin the defendants from reallocating undistributed donations designated to Boy Scout councils during the 1999 Campaign, and to enjoin them from "failing to take all necessary steps to ensure the inclusion of Boy Scout councils in Connecticut as participants in the 2000 Charitable Campaign."

The Court heard oral argument on the preliminary injunction on June 19, 2000, and on June 26, 2000, the Court ordered the defendants to refrain from distributing any charitable donations made by Connecticut state employees to the BSA, but instead to establish an escrow account [1] and deposit into it all funds that Connecticut State employees designated and authorized to be deducted from their paychecks for donation to the BSA in the 1999 Campaign, and all undesignated funds to which the BSA would be entitled under the rules and regulations of the Campaign. The Committee had taken no action with regard to the Year 1999 Campaign, and the BSA continued to receive state employee donations right up to the time the Court issued the order establishing the escrow account.

On November 15, 2000, the CHRO issued a declaratory ruling answering the

---

1. All escrowed funds are to be held and maintained by the State Treasurer in an interest-bearing account within the State's Short Term Investment Fund, established pursuant to Conn. Gen.Stat. § 3–27a, and such funds are to be available for disbursement within five business days pursuant to further order of this Court.

first question raised by the Committee. The CHRO found that although the BSA may lawfully exclude openly gay men and/or avowed homosexuals as adult leaders, its policy of excluding gay employees is covered by Connecticut's anti-discrimination statutes.

On July 7, 2000, the CHRO received another request for a declaratory ruling from the Committee asking:

What is the effect of the United States Supreme Court decision in *Boy Scouts of America v. Dale*, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000)[2] on the CHRO's Declaratory Ruling dated May 12, 2000, and issued to the SECC?

On February 8, 2001, the CHRO issued its declaratory ruling and concluded that *BSA v. Dale* does not substantively impact the CHRO's declaratory ruling dated May 12, 2000. The CHRO found that the Committee's inclusion of the Boy Scout member agencies violates Connecticut's Gay Rights Law.

It is undisputed that the BSA excludes known or avowed homosexuals from participating as adult volunteer leaders. The BSA refuses to employ known or avowed homosexuals, and also prohibits gay boys from membership and from participating in scouting. Finding that the administration and effectuation of the Campaign constitutes state action, the CHRO concluded that the inclusion of a known discriminator as a beneficiary of the Campaign would cause the state to be a party to discrimination in violation of the Gay Rights Law.

### DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when reason-

able minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *American International Group, Inc. v. London American International Corp.,* 664 F.2d 348, 351 (2d Cir.1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

*Issue.*

 In general, federal courts give considerable deference to the judgment of administrative agencies that are in charge of enforcing the statute at issue. *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Similarly, Connecticut courts defer to the statutory interpretation of Connecticut administrative agencies with such enforcement powers. *Nichols v. Warren,* 209 Conn. 191, 202, 550 A.2d 309 (1988). However, the Connecticut Supreme Court has stated that where a state statute is interpreted by a state administrative agency in the first instance, and has not previously been subjected to

**2.** 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000).

judicial scrutiny, such statutory construction is a question of law and the agency interpretation is not entitled to any special deference. *Id.* at 203, 550 A.2d 309; *Burinskas v. Dept. of Social Services,* 240 Conn. 141, 147, 691 A.2d 586 (1997).

The statutes at issue here, Conn. Gen. Stat. §§ 46a–81a through 46a–81r, are collectively known as the Gay Rights law. The specific sections that apply to this action are §§ 46a–81i, 46a–81l, and 46a–81n, whereby the state is prohibited from using any of its facilities in the furtherance of discrimination or becoming a party to any agreement or plan which has the effect of sanctioning discrimination.

■ This Court deems that deference to the CHRO is warranted in the instant case. This is not a case of first impression in which interpretation of the Gay Rights Law regarding state action is being subjected to judicial scrutiny for the first time. The controlling case law is the Connecticut Supreme Court's decision in *Gay and Lesbian Law Students Assn. v. Board of Trustees,* 236 Conn. 453, 673 A.2d 484 (1996),[3] and the CHRO was required to follow that case precedent in its declaratory ruling.

### BSA alleges violation of 42 U.S.C. § 1983

■ The BSA alleges that its exclusion from participation in the Campaign violates its right to freedom of speech and freedom of association protected by the First and Fourteenth Amendments to the United States Constitution. It alleges that the state of Connecticut cannot exclude the BSA from a state-created charitable forum on the basis of viewpoints with which the Committee may disagree.

■ The parties are in agreement that the controlling law on this issue may be found in *Cornelius v. NAACP Legal Defense and Educational Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). *Cornelius* establishes the rules that are applicable to a governmental workplace campaign: (1) the campaign is a non-public forum; (2) no finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is mandated; and (3) exclusion of a participant from the campaign need only be reasonable, viewpoint neutral and based upon all the surrounding circumstances. *Id.* at 806–09, 105 S.Ct. 3439. The defendants allege, and this Court agrees, that the cases cited by the BSA are all cases that involve public fora or limited public fora as opposed to the nonpublic forum designation of a government employer-sponsored workplace charitable campaign as set forth in *Cornelius.* Exclusion from a public forum requires a compelling state interest, a much more stringent requirement than the reasonableness test of exclusion from a nonpublic forum: "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* at 806, 105 S.Ct. 3439. The Court recognizes that compliance with a neutral non-discrimination law is a reasonable requirement for inclusion in the Campaign.

The BSA alleges it was targeted for exclusion from the Campaign for its views on homosexuality while other known discriminating organizations were allowed to participate. The BSA admonishes the Court that "any fool knows that the Girl

---

**3.** The Connecticut Supreme Court held that the United States military was prohibited from using the facilities and career services office of the University of Connecticut School of Law for recruitment purposes because of the military's current discrimination against gay men and lesbians.

Scouts limit membership to girls, and it is obvious from their names that the National Black Child Development Institute devotes itself to African–American children and that Services for the Elderly in Farmington limits its services on the basis of age." [4]

To support this allegation, the BSA cites a Florida case, *Boy Scouts of America v. Till*, 136 F.Supp.2d 1295 (S.D.Fla.2001), where the school board for Fort Lauderdale was preliminarily enjoined from excluding Boy Scouts from meeting in public schools. The BSA opines that "there, as here, the school board, while requiring all organizations to sign a nondiscrimination form, permitted school use by a whole variety of organizations which discriminated on a number of grounds—including Girl Scouts, church groups, and a black sorority."

The BSA is misguided in its reliance on *Till*. In that case, the Broward County School Board had an anti-discrimination policy, known as Policy 1341, that prohibited the rental use or enjoyment of school facilities by any group that "discriminates on the basis of age, race, color, disability, gender, marital status, national origin, religion, or sexual orientation." Prompted by the Supreme Court decision in *B.S.A. v. Dale*, and the Boy Scout's policy of excluding homosexual children and adults from group membership, the school board terminated the five-year partnership agreement it had with the Boy Scouts, and deemed the Boy Scouts ineligible to rent and lease school facilities because of the

violation of the School Board's anti-discrimination policy. The Boy Scouts brought action against the school board, alleging that their exclusion from school facilities during off-school hours violated the First Amendment. The Boy Scouts moved for preliminary injunction, which was granted by the district court.

Unlike the Connecticut Gay Rights law which governs here, the Florida Civil Rights Act of 1992, F.S.A. §§ 760.01—760.10, does not protect individuals from discrimination because of sexual orientation. Despite the School Board's stated and commendable goal of preparing its children for participation as citizens and teaching them tolerance, the Broward County School Board did not have the benefit of a state anti-discrimination law to back it up. The district court held that the exclusion of the Boy Scouts from use of the school facilities was viewpoint-based, and that the BSA was likely to prevail on its claim. Additionally, the forum created in *Till* was a limited public forum, unlike the non-public forum in *Cornelius* and in the present action.

It is undisputed that the BSA is in the unique position of being allowed to discriminate legally against gays and lesbians by the ruling of the United States Supreme Court. In *B.S.A. v. Dale*, the Court ruled that New Jersey's law against discrimination which forced the Boy Scouts to admit James Dale, an openly gay assistant scoutmaster, violated the BSA's freedom of expressive association. The result of

---

4. Addressing the BSA's conviction that the Girl Scouts of America also discriminates because it limits its membership to girls, the Court directs the BSA to the exceptions to sex discrimination under 20 U.S.C. § 1681:

(a) Prohibitions against discrimination; exceptions

(6) Social fraternities or sororities; voluntary youth service organizations this section shall not apply to membership practices—

(B) Of the Young Men's Christian Association, Young Woman's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age.

the case is clear: the BSA has a right to exclude homosexuals.

In the present case, neither the Committee or the CHRO is attempting to circumvent the Supreme Court by forcing the BSA to admit homosexuals in violation of the *Dale* ruling. It has been readily acknowledged by all parties that the BSA may discriminate on the basis of sexual orientation. If the BSA changes its policy in the future and no longer discriminates, and attests to that in its application to the Campaign, the Committee could legally allow them to participate, but the issue before this Court is not a matter of the BSA's viewpoint on homosexuality, but of the BSA's compliance with the laws of the State of Connecticut.

The BSA also provides a list of groups which have "views on the morality of homosexual conduct," and are still allowed to participate in the Campaign. The list includes Parents, Families, & Friends of Lesbians and Gays ("PFLAG"), which the BSA states "opposes Boy Scouts' moral views regarding homosexual conduct, and asserts that one's sexual orientation and gender identity are separate from one's moral values and actions." The BSA does not, however, allege any discrimination on the part of PFLAG, or the other groups that it categorizes as gay and lesbian organizations, regarding their membership or employment practices.

The BSA correctly states that the Campaign "does not prohibit groups that teach moral values, groups that seek to build character, groups that serve youth, groups that serve one sex, groups with a religious perspective, or groups that take a position on the morality of homosexual conduct—all of which might describe the Boy Scouts." However, the CHRO points out that the BSA confuses "discriminatory membership and employment policies, like theirs, with the provision of services by organizations having their missions directed to help groups identified by, for example, sex, race, age, ethnic background, religion, or sexual orientation." The record does not support the BSA's intimation of discrimination by such groups.

The BSA concedes that the Connecticut Supreme Court sets forth the law which all state agencies must follow. In *Gay and Lesbian Law Students Assn.*, that court stated that "the public policy of this state is unequivocal: Discrimination based upon sexual orientation is prohibited and those who persist in discriminating against gay men and lesbians will, among other sanctions, be barred from utilizing state facilities unless specifically exempted." 236 Conn. at 491, 673 A.2d 484.

In Conn. Gen.Stat. §§ 46a–81p and 46a–81q, the Connecticut legislature specifically exempted religious groups and the ROTC from the Gay Rights Law. "Where express exceptions are made, the legal presumption is that the legislature did not intend to save other cases from the operation of the statute." *Gay and Lesbian Law Students Assn.*, 236 Conn. at 495, 673 A.2d 484. The legislative history discloses that Boy Scouts, Girl Scouts, and camps for young people, both church-affiliated and non-church affiliated, were discussed. In response to a question of whether the hiring practices of a private, non-church affiliated camp for young men would be exempted from the law, Representative Tulisano, sponsor of the legislation, responded that the bill's exemption was limited to religious organizations and entities so that there would not be an exemption for non-religious organizations. The opportunity to exempt the Boy Scouts from the Gay Rights Law was available to the legislature, but was not seized upon by that body.

Finally, the BSA claims that had it not been excluded from the Campaign, the BSA would have completed and returned the nondiscrimination form as it had in

prior years, checking "Yes" to Question 11 of the application (asking whether the organization is in compliance with non-discrimination law). The BSA asks the Court to declare that its lawful and constitutionally-protected right to discriminate on the basis of sexual orientation is synonymous with compliance with the non-discrimination laws of the state, specifically, the Gay Rights Law. The Court finds to the contrary.

In accordance with the Connecticut Supreme Court's ruling in *Gay and Lesbian Law Students Assn.*, the plain language of the Connecticut statutes, and the CHRO's interpretation of same, this Court finds that the BSA has failed to satisfy its burden of establishing a violation of the BSA's constitutional rights by the Committee under 42 U.S.C. § 1983.

### *Violation of Connecticut Agencies Regulations § 5–262–3(k)*

■ The BSA alleges that removal of the BSA from the Campaign constitutes a violation under § 5–262–3(k) of the Regulations of Connecticut State Agencies. That section states in pertinent part that an organization is eligible to participate in the Charitable Campaign so long as it has a stated policy of nondiscrimination and is in compliance with all the requirements of law and regulations respecting non-discrimination, equal employment opportunity, and public accommodations with respect to its programs, clients, officers, employees, and volunteers.

At the time the BSA filed its complaint, the Commission had not declared whether the BSA membership policies of excluding persons who openly hold themselves out as homosexuals violated any Connecticut anti-discrimination statute. Consequently, the BSA deems that there was no basis in state law for excluding them from the Campaign. On November 15, 2000, however, the CHRO did deliver its declaratory ruling, and held that the BSA was in viola-

tion of Connecticut's Gay Rights Law. In addition, the U.S. Supreme Court ruling in *Dale* left no doubt that the BSA has the right to discriminate, and to exclude persons who openly hold themselves out as homosexuals. Consequently, the Court finds no violation of the Connecticut State Agency Regulations on the part of the defendants.

### *Violation of Conn. Gen.Stat. § 46a–81r*

■ The BSA next alleges that to the extent that the Committee seeks to penalize the BSA for excluding open homosexuals from leadership positions, it would be illegally condoning homosexuality and requiring the teaching in educational institutions of homosexuality as an acceptable lifestyle, in violation of Conn. Gen.Stat. § 46a–81r. The BSA states that it is an educational institution that instills its values in boys through adult role models.

Section 46a–81r states in pertinent part that

> Nothing in sections 4a–60a, 45a–726a, 46a–51, 46a–54, 46a–54, 46a–56, 46a–63, 46a–64b, 46a–65, 46a–67, 46a–68b, and 46a–81a to 46a–81q, inclusive, subsection (d) of section 46a–82, subsection (a) of section 46a–83, and sections 46a–86, 46a–89, 46a–90a, 46a–98, 46a–98a, and 46a–99 shall be deemed or construed (1) to mean the state of Connecticut condones homosexuality or bisexuality or any equivalent lifestyle, (2) to authorize the promotion of homosexuality or bisexuality in educational institutions or require the teaching in educational institution of homosexuality or bisexuality as an acceptable lifestyle . . . .

The Connecticut Statutes do not give a definition of educational institutions per se, so the Court looks again to the United States Code, specifically 20 U.S.C. § 1681(c), for guidance. Educational institution is defined, for purposes of Chapter

38 on Discrimination Based on Sex or Blindness, as

> any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such school means each such school, college, or department.

Not only does the BSA fail to fit this definition of educational institution, they are specifically categorized under "social fraternities or sororities; voluntary youth service organizations" under 20 U.S.C. 1681. The Court finds no merit in the BSA's argument that it is an educational institution under the law.

The Committee argues, and the Court concurs, that it is not attempting to coerce the BSA into accepting homosexuals as volunteers, employees, or members, in violation of the ruling in *B.S.A. v. Dale.* The plain language of Conn. Gen.Stat. § 46a–81r states that the anti-discrimination statutes are not to be construed as the state of Connecticut condoning homosexuality or any other alternative lifestyle. Likewise, the actions of the Committee in adhering to the laws of the state are not to be construed as state action condoning homosexuality. The Court finds no violation of Conn. Gen.Stat. § 46a–81r.

### Violation of Conn. Gen.Stat. § 46a–81a

█ The BSA alleges that it is being penalized by the Committee for "having a preference for heterosexuality," in violation of Conn. Gen.Stat. § 46a–81a. Because the section allegedly violated is the definition section for the statutes known as the Gay Rights Law, the Court construes the BSA's allegation as a violation of the Gay Rights Law for reverse discrimination. The BSA is misguided in substituting a definition of sexual orientation for the substantive statutes. There is no stat-

ute penalizing an individual or entity for sexual preference, be it heterosexual, homosexual, or bisexual, nor is the Committee doing so. The prohibition is on discriminating against an individual on the basis of his or her preference. That fact that the BSA may legally discriminate on the basis of sexual orientation is *res judicata.* The Committee must react on this basis, and adhere to the statutory and case law under which it is bound by law, as interpreted by the CHRO. It has been determined that the Committee's action in terminating the BSA's participation in the Campaign was view-point neutral. The BSA's circular reasoning under this count is unpersuasive.

### Conclusion

For the reasons set forth above, the BSA's motion for summary judgment (Doc. # 56) is DENIED. Defendant Committee's motion for summary judgment (Doc. # 50) is GRANTED. Defendant-intervenor CHRO's motion for summary judgment (Doc. # 53) is GRANTED.

The motions for temporary restraining order (Doc.# 3), preliminary injunction (Doc. # 4), to dismiss (Doc. # 20), and to modify [15–1] order (Doc. # 34), are DENIED AS MOOT.

SO ORDERED.