335 F.3d 80
 BOY SCOUTS OF AMERICA and Connecticut Rivers Council, Boy Scouts of America, Plaintiffs-Appellants,
v.
Nancy WYMAN, in her capacity as Comptroller of the State of Connecticut and as a member of the Connecticut State Employee Campaign Committee, Carol Carney, in her capacity as Chair of the Connecticut State Employee Campaign Committee, Margaret Diachenko, Richard Edmonds, Paluel Flagg, Christine Fortunato, Burton Gold, Carol Guiliano, Carol Hamilton, Marilyn Kaika, Joan Kelly-Coyle, D'Ann Mazzocca, Bernard McLoughlin, Michael Nichols, William Phillie, Cheryl Swain, Noel Thomas, in their capacities as members of the Connecticut State Employee Campaign Committee, Defendants-Appellees,
Commission on Human Rights & Opportunities, Intervenor-Defendant-Appellee,
Connecticut Coalition for Lesbian, Gay, Bisexual & Transgender Civil Rights, Connecticut Women's Education and Legal Fund, Inc. and Gay & Lesbian Advocates & Defenders, Movants.
 No. 02-9000.
 United States Court of Appeals, Second Circuit.
 Argued: April 23, 2003.
 Decided: July 9, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED George A. Davidson (Carla A. Kerr, on the brief) Hughes Hubbard & Reed LLP, New York, N.Y. (Daniel L. Schwartz, Day, Berry & Howard LLP, Stamford, Conn., on the brief), for Plaintiffs-Appellants.
 Joseph Rubin, Associate Attorney General, for Richard Blumenthal, Attorney General of Connecticut (William J. Prensky, Assistant Attorney General, on the brief), Hartford, Conn., for Defendants-Appellees.
 C. Joan Parker, Connecticut Commission on Human Rights & Opportunities, Office of Commission Counsel, Hartford, Conn., for Intervenor-Defendant-Appellee.
 Jennifer L. Levi, Gay & Lesbian Advocates & Defenders, Boston, Mass.; Maureen M. Murphy, Murphy, Murphy, Ferrara & Nugent, LLC, New Haven, Conn., for Movants.
 Peter Ferrara, American Civil Rights Union, McLean, Va., for Amicus Curiae American Civil Rights Union, in support of Plaintiffs-Appellants.
 John H. Findley, Harold E. Johnson, Pacific Legal Foundation, Sacramento, Cal., for Amicus Curiae Pacific Legal Foundation, in support of Plaintiffs-Appellants.
 Jamie L. Mills, Hartford, Conn., for Amicus Curiae Connecticut Voices for Children, Connecticut Parents, Families and Friends of Lesbians and Gays, Inc., Connecticut Sexual Assault Crisis Services, Inc., Gay Lesbian and Straight Education Network, Hartford Gay and Lesbian Health Collective, Institute for Community Research, and True Colors, Inc., in support of Defendants-Appellees and Intervenor-Defendant-Appellee.
 Before: CALABRESI, F.I. PARKER, and SACK, Circuit Judges.
 CALABRESI, Circuit Judge.
 
 
 1
 In May 2000, the Connecticut State Employee Campaign Committee denied the application of the Connecticut Rivers Council, a local chapter of the Boy Scouts of America, to participate in the state's workplace charitable contribution campaign. That decision was based on a ruling by the Connecticut Commission on Human Rights and Opportunities that the Boy Scouts of America's policy of excluding homosexuals from membership and employment positions meant that the local chapter's participation in the campaign would contravene state law. The Boy Scouts brought suit for violations of their First Amendment right of expressive association, see Boy Scouts of America v. Dale, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000), and of Connecticut State law. The United States District Court for the District of Connecticut (Eginton, J.) granted the defendants' motion for summary judgment. We hold that the removal of the Boy Scouts from this nonpublic forum did not violate the Boy Scouts' First Amendment right to expressive association. We also hold that there was no violation of Connecticut law. Accordingly, we affirm the judgment of the district court.
 
 BACKGROUND
 
 2
 The Connecticut legislature has established an annual workplace charitable campaign (the "Campaign") to "raise funds from state employees for charitable and public health, welfare, environmental, conservation and service purposes." Conn. Gen.Stat. § 5-262. The Campaign is conducted from September to November each year. State employees make voluntary contributions to charities selected from a list of participating organizations set forth in a booklet that is distributed at the workplace. Gifts are made by payroll deduction. The amount deducted is collected by the Comptroller and transmitted to a principal combined fund-raising organization, usually a United Way, that administers the Campaign for the state.
 
 
 3
 The Campaign is governed by a State Employee Campaign Committee (the "Committee") whose voting members include: the Comptroller or her designee, the Commissioner of Administrative Services or his designee, the executive director of the Joint Committee on Legislative Management or his designee, ten state employees and two retired state employees. Conn. Gen.Stat. § 5-262(b). Committee members who are current state employees continue to be paid their state salaries while they work on the Campaign during normal business hours. Similarly, state agencies are encouraged to loan employees to the Committee to work on the Campaign. Conn. Agencies Regs. § 5262-2(d). But the State does not contribute to the Committee's budget or fund the operations of the Campaign. Operating costs are furnished by the participating charities.
 
 
 4
 Member organizations participate through federations. A member organization files its Campaign application with its parent federation, which maintains the application. The parent federation then files an annual application with the Committee attesting to its member organizations' compliance with all of the Committee's requirements. The application requires, inter alia:
 
 
 5
 a document signed by an officer or the executive director of a federation, certifying... that the federation maintains on file the following documents for itself and for each member agency .... (vii) a written policy of non-discrimination.
 
 
 6
 Conn. Agencies Regs. § 5-262-4(a)(4). The Committee, acting through a subcommittee, reviews all applications for completeness and for compliance with eligibility standards. The Committee's regulations also provide for the removal of a federation or one of its member organizations from a campaign if that federation or member organization fails to adhere to the eligibility requirements or the policies and procedures of the Campaign. Conn. Agencies Regs. § 5-262-5(a). If a member organization's eligibility to participate in the Campaign is withdrawn by the Committee, the federation may not distribute any funds raised in the Campaign to that organization. Conn. Agencies Regs. § 5-262-5(c).
 
 
 7
 The Connecticut Rivers Council, Boy Scouts of America, is a private, nonprofit organization chartered by the Boy Scouts of America to support scouting in the Connecticut counties of Litchfield, Hartford, Windham, New London, and Middlesex. (The Connecticut Rivers Council and Boy Scouts of America have submitted a joint brief to this court and will be referred to collectively as the "BSA.") The Connecticut Rivers Council and three other Connecticut councils are member agencies of local chapters of the United Way. The BSA has participated in the Campaign for 30 years. In its applications, the BSA affirmatively answered that it had a written policy of nondiscrimination. In 1999, some state employees earmarked their Campaign donations for the BSA and, upon application to its local United Way, the BSA received corresponding disbursements.
 
 
 8
 The Connecticut Commission on Human Rights and Opportunities ("CHRO") is the independent state agency that is "charged with the primary responsibility of determining whether discriminatory practices have occurred and what the appropriate remedy for such discrimination must be." Dep't of Health Servs. v. Comm'n on Human Rights & Opportunities ex rel. Mason, 198 Conn. 479, 503 A.2d 1151, 1156 (1986).
 
 
 9
 On October 6, 1999, Cynthia Watts Elder, the Executive Director of the CHRO, wrote an unsolicited memorandum to the Committee indicating her concern that, by allowing the BSA to participate in the Campaign and to benefit from a fundraiser that used state resources, the Committee potentially made the state a party to discrimination in violation of Connecticut's Gay Rights Law, Conn. Gen.Stat. §§ 46a-81a — 46a-81r. The impetus for the letter was the New Jersey Supreme Court's decision in Dale v. Boy Scouts of America, 160 N.J. 562, 734 A.2d 1196 (N.J.1999), which, as described by Watts Elder in her memorandum, had "decided that it is discriminatory for the Boy Scouts of America to expel an Assistant Scoutmaster who publicly declared that he was gay."
 
 
 10
 In reaction to the October 6, 1999 letter from the CHRO, the Committee sought an immediate clarification from the BSA. On October 12, 1999, Harry Pokorny, Scout Executive of the Connecticut Rivers Council, sent a letter in response that expressed the BSA's national position on homosexuality, which was that "[i]f an individual does indicate that they are homosexual we can not register them." In the BSA's Local Rule 9(c)(2) Statement in Response to Defendant-Intervenor's Local Rule 9(c)(1) Statement, the BSA stated its policy as follows:
 
 
 11
 In the exercise of its constitutional rights, Boy Scouts does not employ known or avowed homosexuals as commissioned professional Scouters or in other capacities in which such employment would interfere with Scouting's mission of transmitting values to youth. However, other jobs within Scouting are open to known or avowed homosexuals..... In the exercise of its constitutional rights, Boy Scouts does not register known or avowed homosexuals as adult volunteer leaders or youth members.
 
 
 12
 The Boy Scouts of America's position on sexual orientation was memorialized in its writings as long as twelve years ago. See Boy Scouts of Am. v. Dale, 530 U.S. 640, 651-53, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000).
 
 
 13
 Because of the apparent conflict between the BSA's certification that it had a nondiscrimination policy and the October letter explaining the Boy Scouts' national position on homosexuality, the Committee, on November 19, 1999, petitioned the CHRO for a declaratory ruling on two questions:
 
 
 14
 1. Does the BSA's and/or its local councils' policy or policies on sexual orientation violate any state anti-discrimination statute or regulation over which your agency has any oversight or jurisdiction?
 
 
 15
 2. Is the Committee's inclusion of BSA member agencies in the State Employee Campaign in violation of any state law over which your agency has oversight or jurisdiction, including but not limited to Conn. Gen. Stat. Sections 46a-81d, 46a-81l and 46a-81n?
 
 
 16
 The CHRO sought and received information from the Committee, the BSA and other interested parties in the course of the declaratory rulings proceedings. On April 27, 2000, the CHRO conducted a fact-finding hearing to assist it in rendering its decision. The CHRO issued its first declaratory ruling on May 12, 2000, in which, answering the second question, it concluded that if the Committee were to retain the BSA in the Campaign, the state would be in violation of those sections of Connecticut's Gay Rights Law that the Committee had listed in its petition. The May 12, 2000 ruling did not answer the Committee's first question.
 
 
 17
 In accordance with the CHRO's ruling, the Committee on May 15, 2000, notified the various United Way federations that their member Boy Scout Councils would not be able to participate in the upcoming Year 2000 Campaign.
 
 
 18
 On June 7, 2000, the BSA filed a complaint in the United States District Court for the District of Connecticut charging violations of (1) 42 U.S.C. § 1983, for infringements of its First Amendment rights; (2) the state regulations governing participation in the Campaign, Conn. Agencies Regs. § 5-262-3(k); (3) a state statute, which the BSA characterized as prohibiting the State from promoting homosexuality in educational institutions, Conn. Gen.Stat. § 46a-81r; and (4) a state statute prohibiting the State from discriminating against persons having a preference for heterosexuality, Conn. Gen.Stat. § 46a-81a.
 
 
 19
 On June 26, 2000, the Supreme Court handed down a decision in Boy Scouts of America v. Dale, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000), which held that New Jersey's application of its anti-discrimination law to compel the Boy Scouts to accept a homosexual gay activist as an assistant scoutmaster violated the Boy Scouts' First Amendment right to expressive association. The Committee held a meeting on July 7 to discuss its course of action in light of Dale. On the same day, the Committee filed a "Request for Clarification" with the CHRO asking:
 
 
 20
 What is the effect of the United States Supreme Court decision in Boy Scouts of America v. Dale, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) on the CHRO's declaratory ruling dated May 12, 2000 and issued to the [Committee]?
 
 
 21
 On July 31, the Committee excluded 29 organizations from the Campaign for failing to certify their acceptance of a revised non-discrimination policy.
 
 
 22
 On November 15, 2000, the CHRO issued a declaratory ruling answering the first question posed in the Committee's November 19, 1999 petition (the question it had left unanswered in its May 12, 2000 ruling). It held (1) that the BSA's policy of excluding gay employees was covered by Connecticut's anti-discrimination statutes, but that violations would have to be determined on a case-by-case basis in light of whether the employment position was a leadership one; (2) that under the Supreme Court's decision in Dale, Connecticut could not prevent the BSA from excluding openly gay men and/or avowed homosexuals as adult leaders; and (3) that it was not prepared to rule on the legality of the BSA's exclusion of gay youths from membership.
 
 
 23
 Subsequently, on February 8, 2001, the CHRO issued a ruling on the Committee's July 7, 2000 petition. In this decision, it concluded that Dale did not substantively impact the CHRO's declaratory ruling of May 12, 2000.
 
 
 24
 On February 28, 2001, the CHRO moved to intervene as a defendant in the district court case that the BSA had initiated. The CHRO's stated interest was "to ensure that state facilities not be used in furtherance of discrimination and that State employees not be subjected to solicitation on behalf of discriminating organizations, and that its Declaratory Rulings have the full force and effect of the law." The district court granted that motion.
 
 
 25
 After completing discovery, the BSA, the Commission and the CHRO all filed motions for summary judgment. On July 22, 2002, the district court granted summary judgment to the defendants on all of the BSA's claims. Boy Scouts of Am. v. Wyman, 213 F.Supp.2d 159 (D.Conn.2002).
 
 
 26
 In reaching its conclusion that there was no First Amendment violation, the court relied on Cornelius v. NAACP Legal Defense & Educational Fund, Inc., 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), which held that a law excluding legal defense and advocacy organizations from a similar federal workplace charitable campaign would be permissible under the First Amendment if the exclusion was (1) viewpoint neutral and (2) reasonable. Id. at 806-09, 105 S.Ct. 3439. The district court expressly rejected the BSA's claim that because other non-excluded participants in the Campaign (e.g., Parents, Families, & Friends of Lesbians and Gays) discriminated in the provision of services, its anti-homosexual message was singled out for different treatment. It based this holding on its finding that the BSA had presented no evidence that non-excluded organizations discriminated in their membership or employment practices, as did the BSA. Wyman, 213 F.Supp.2d at 166-68.
 
 
 27
 The district court also held that the CHRO's reading of Connecticut law was correct.[1] It found that there was no violation of Connecticut Agency Regulations § 5-262-3(k) because on November 15, 2000, the CHRO had correctly ruled that the BSA was in violation of Connecticut's Gay Rights law. Id. at 169. It determined that there was no violation of the statutory provision that the BSA claimed to bar the promotion of homosexuality in educational institutions, Conn. Gen.Stat. § 46a-81r, because the BSA was not an educational institution and the Committee's actions could not be construed as a state action condoning homosexuality. Id. at 169-70. Finally, the district court rejected the BSA's claim that its exclusion from the Campaign violated Connecticut's law prohibiting discrimination against persons having a preference for heterosexuality, Conn. Gen.Stat. § 46a-81a, on the basis of the court's prior conclusion that the exclusion of the BSA from the Campaign was viewpoint neutral. Id. at 170.
 
 
 28
 The BSA appeals the district court's grant of summary judgment in its entirety, arguing that the Committee violated both the First Amendment and Connecticut State law when it terminated the BSA's participation in the Campaign.
 
 DISCUSSION
 
 29
 We review the district court's rulings on the motions for summary judgment de novo, examining the evidence in the light most favorable to, and drawing all inferences in favor of, the BSA. Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002). Summary judgment is appropriate only when there is no genuine issue as to any material fact. Id. "Where cross-motions for summary judgment are filed, a court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Id. (internal quotation marks omitted).
 
 I. The First Amendment
 
 30
 The BSA argues that Connecticut has violated its First Amendment right of expressive association, a right that the Supreme Court recognized in Boy Scouts of America v. Dale, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). Dale held that New Jersey's attempt to require that the Boy Scouts admit a homosexual gay activist as a scout leader unconstitutionally infringed on the Boy Scouts' First Amendment right to expressive association. The BSA argues that by conditioning its participation in the Campaign on a change in its membership policies, the defendants violated the BSA's constitutional right to expressive association.
 
 
 31
 In order to prevail, the BSA must establish two propositions. First, it must show that it was excluded from the Campaign because of acts protected by the First Amendment. The defendants argue that the decision to exclude the BSA from the Campaign was based on BSA employment and membership policies that are not protected by the First Amendment even after Dale. Second, assuming that the BSA's removal from the Campaign was a consequence of the BSA's exercise of its First Amendment right to expressive association, the BSA must establish that that removal violated the Constitution. That is, if the BSA's removal from the Campaign was the result of the BSA's exercise of its First Amendment rights, then in order to show a constitutional violation under governing law, the BSA must demonstrate that the Committee's decision to exclude it from the Campaign was either unreasonable or viewpoint discriminatory. We consider each of these issues in turn.
 
 
 32
 A. The Scope of the BSA's First Amendment Right to Expressive Association
 
 
 33
 The parties differ on how Dale should be read. In particular, they disagree, first, as to whether Dale held that the Boy Scouts has a First Amendment right to exclude all avowed homosexuals, or only homosexuals who publicly voice a viewpoint that is contrary to the Boy Scouts' position on homosexuality, and, second, as to whether under Dale the Boy Scouts has a right to exclude homosexuals (whether gay activists or not) from all membership or employment positions, or only from those leadership positions through which the Boy Scouts expresses its message. The BSA and its amici argue for the broader interpretation, under which the BSA may exclude any homosexual from any position. The defendants and their amici argue for the narrower reading, according to which Dale held only that the Boy Scouts has a First Amendment right to exclude (a) gay activists from (b) leadership positions.[2]
 
 
 34
 The CHRO advances the following argument for its narrow reading of Dale. Dale states that some deference is due to an organization's assertions, first, as to what message it intends to express and, second, with respect to whether allowing a member of a given group to occupy a specified position in the organization would impair that message. Dale, 530 U.S. at 651-53, 120 S.Ct. 2446. But as to the second question — the effect of a certain individual occupying a given position within the organization — Dale cautions that this "is not to say that an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." Id. at 653, 120 S.Ct. 2446. And the Dale opinion goes on to examine closely (and ultimately to agree with) the Boy Scouts' position that allowing Dale to occupy a leadership position would impair its expressive association. Id. at 653-56, 120 S.Ct. 2446. Consequently, the CHRO maintains, Dale requires that courts engage in an independent evaluation of whether the inclusion of a given individual in a specific position will infringe on an organization's right to expressive association.[3]
 
 
 35
 Moreover, the CHRO argues, in scrutinizing the Boy Scouts' claim that admitting Dale as an adult leader would compromise its expressive association, Dale relied heavily on Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc., 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). See Dale, 530 U.S. at 653-54, 659, 120 S.Ct. 2446. Hurley held that the organizers of the Boston St. Patrick's Day Parade had a First Amendment right to exclude a group of gay, lesbian and bisexual decedents of Irish immigrants, which went by the acronym "GLIB," from the parade.
 
 
 36
 In explaining the outcome of Hurley, Dale emphasizes that "parade organizers did not wish to exclude the GLIB members because of their sexual orientations, but because they wanted to march behind a GLIB banner." Id. at 653, 120 S.Ct. 2446. This, Hurley held, would have interfered with the organizers' "choice ... not to propound a particular point of view, [which] is presumed to lie beyond the government's power to control." Id. at 654, 120 S.Ct. 2446 (quoting Hurley, 515 U.S. at 575, 115 S.Ct. 2338). Dale also suggests that the First Amendment harm at issue in Dale was similar to the harm at stake in Hurley. Id. at 654, 120 S.Ct. 2446 ("As the presence of GLIB in Boston's St. Patrick's Day parade would have interfered with the parade organizers' choice not to propound a particular point of view, the presence of Dale as an assistant scoutmaster would just as surely interfere with the Boy Scout's [sic] choice not to propound a point of view contrary to its beliefs."). It follows, the CHRO argues, that only homosexuals who hold up a "banner" — i.e., who proclaim a message contrary to that of the Boy Scouts — and who occupy expressive positions within the organization — positions, that is, in which that "banner" is on display—threaten the Boy Scouts' protected First Amendment interests. Only their participation would compel the Boy Scouts to associate with a message that it finds objectionable.
 
 
 37
 The CHRO urges that, on this narrow reading of Dale, the exclusion of the BSA from the Campaign raises no constitutional issues at all. The Committee's decision to remove the BSA, the CHRO asserts, was based not on the BSA's exercise of a constitutionally protected right — its right to exclude gay activists from leadership positions — but on the BSA's stated policy of excluding all known or avowed homosexuals from non-leadership positions. That being the case, according to the CHRO, the BSA's participation in the Campaign was not conditioned on its relinquishing its First Amendment rights and, therefore, is not cause for constitutional concern.
 
 
 38
 While the district court granted the defendants summary judgment on a different basis, we may affirm the judgment of the district court on any ground appearing in the record. Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 98 (2d Cir.2000). We therefore can consider the CHRO's argument. On the record before us, however, the CHRO's approach cannot support summary judgment for the defendants. The CHRO's reasons for adopting the narrow reading of Dale are not without some merit. But that interpretation — even if accepted — would only justify summary judgment for the defendants if, making all inferences in favor of the BSA, we concluded that the decision to remove the BSA from the Campaign was in no way based on the BSA's exclusion of gay activists from leadership positions. And this the record before us does not clearly demonstrate.
 
 
 39
 The CHRO's own May 12, 2000 Declaratory Ruling, which held that the BSA's participation in the Campaign violated Connecticut's Gay Rights Law and which was the sole basis for the Committee's decision to remove the BSA from the Campaign, spoke of "the BSA's policy of excluding homosexuals from participation." CHRO Decl. Ruling of May 12, 2000, at 5, 12. It did not distinguish between leaders and non-leaders or between activists and non-activists.[4] It is true that the CHRO's February 8, 2001 Declaratory Ruling, which evaluated the effect of Dale on the May 12, 2000 decision, arguably makes such distinctions, but it does not do so beyond peradventure. CHRO Decl. Ruling of Feb. 8, 2001, at 11. We are required in this appeal to draw all reasonable inferences in favor of the BSA. Hotel Employees, 311 F.3d at 543. And, on the record as a whole, we are unable to say with sufficient certainty that the decision to remove the BSA from the Campaign was not based in part on the BSA's exclusion of gay activists from leadership positions, a practice of the BSA that, under any reading of Dale, is constitutionally protected.
 
 
 40
 Consequently, given the procedural posture of this case, we must assume that the removal of the BSA from the Campaign was triggered at least to some extent by the BSA's exercise of what the Supreme Court has held to be a constitutionally protected right. The question, then, is whether that removal in these circumstances violated the Constitution.
 
 B. The Test for Constitutionality
 
 41
 While Dale's recognition of the Boy Scouts' expressive-associational right to exclude a gay activist from a leadership position sets the stage for the issues in this case, it does not determine their resolution. Dale considered New Jersey's attempt to require the Boy Scouts to admit a person who, the Supreme Court found, would compromise the Boy Scouts' message. Not surprisingly, the Supreme Court held that such state compulsion "directly and immediately affects ... associational rights that enjoy First Amendment protection" and imposes a "serious burden" on them. 530 U.S. at 658-59, 120 S.Ct. 2446. The effect of Connecticut's removal of the BSA from the Campaign is neither direct nor immediate, since its conditioned exclusion does not rise to the level of compulsion. Consequently, Dale does not, by itself, mandate a result in the current case.
 
 
 42
 Rather, this case appears to be governed by two lines of First Amendment cases. The first deals with nonpublic forums and is exemplified by Cornelius v. NAACP Legal Defense & Educational Fund, Inc., 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), which considered the federal government's attempt to exclude legal defense and advocacy groups from a federal workplace charitable campaign. Cornelius held that the federal charitable campaign was a nonpublic forum and concluded that access to the campaign "can be restricted as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." Id. at 800, 105 S.Ct. 3439 (internal punctuation omitted).
 
 
 43
 The second relevant line of cases is often described as the doctrine of unconstitutional conditions, which holds that the government may not condition certain government benefits on the relinquishment of constitutional rights. Like the nonpublic forum cases, this doctrine permits some, but not all, restrictions on speech and associational rights. Thus, for instance, in Regan v. Taxation with Representation of Washington, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), the Supreme Court upheld a prohibition on substantial lobbying by 501(c)(3) charitable organizations. So long as the government did not discriminate invidiously in such a way as to "aim[] at the suppression of dangerous ideas," all that was required, the Court held, was that the exemption be rational. Id. at 548, 550, 103 S.Ct. 1997 (internal punctuation and quotation marks omitted). See also NEA v. Finley, 524 U.S. 569, 587, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) ("If the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case. We have stated that, even in the provision of subsidies, the Government may not `ai[m] at the suppression of dangerous ideas.'" (quoting Regan, 461 U.S. at 550, 103 S.Ct. 1997) (alternation in original)).
 
 
 44
 The case before us lies at the intersection of these two lines of authority and it makes no difference under which line we analyze it. Whether viewed as denial of access to a nonpublic forum or as the denial of a government benefit, the BSA's exclusion is constitutional if and only if it was (1) viewpoint neutral and (2) reasonable.[5] Cornelius, 473 U.S. at 800, 105 S.Ct. 3439; Regan, 461 U.S. at 550, 103 S.Ct. 1997. Consequently, we need not classify this case under one heading or another, but have the benefit of viewing it stereoscopically.
 
 1. Viewpoint Neutrality
 
 45
 We begin with the more fundamental question, which is whether the removal of the BSA from the Campaign was viewpoint discriminatory. The BSA and its amici essentially raise two challenges under the heading of viewpoint discrimination. The first is that Connecticut's Gay Rights Law is viewpoint discriminatory on its face. The second is that the defendants applied the law to the BSA in a viewpoint discriminatory manner.
 
 
 46
 
 a) Is Connecticut's Gay Rights Law in itself viewpoint discriminatory?
 
 
 
 47
 On its face, Connecticut's Gay Rights Law prohibits discriminatory membership and employment policies not because of the viewpoints such policies express, but because of the immediate harms — like the denial of concrete economic and social benefits — such discrimination causes homosexuals. That is, as written, Connecticut's Gay Rights Law regulates membership and employment policies as conduct, not as expression and, as such, is not obviously viewpoint discriminatory.
 
 
 48
 Both the nonpublic-forum and the unconstitutional-conditions cases hold, however, that it is not enough that a law appear viewpoint-neutral on its face. A reviewing court must also determine that the rule is not a facade for viewpoint discrimination. See Cornelius, 473 U.S. at 811-13, 105 S.Ct. 3439 (holding that "[t]he existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination," and remanding for determination of "whether the exclusion of respondents was impermissibly motivated by a desire to suppress a particular point of view"); Regan, 461 U.S. at 548, 103 S.Ct. 1997 (emphasizing that there is "no indication that the statute was intended to suppress any ideas or any demonstration that it has had that effect").
 
 
 49
 The BSA and its amici argue, and we agree, that Connecticut's Gay Rights Law has a differential adverse impact[6] on attempts to voice anti-homosexual viewpoints through the medium of expressive association. As a general matter, all anti-discrimination laws that govern organizations' membership or employment policies have a differential and adverse impact on those groups that desire to express through their membership or employment policies viewpoints that favor discrimination against protected groups. A law that penalizes race-based discrimination in membership or employment will almost inevitably have a particularly adverse impact on the expression of doctrines like that of racial superiority to the extent that these doctrines are sought to be stated and spread through membership or employment practices. Similarly, and for the same reason, Connecticut's Gay Rights Law has a foreseeably adverse impact on the expressive abilities of organizations that seek through their membership and employment policies to voice their view that homosexuality is immoral. Since the medium is, in part, the message, any regulation of the medium will to some extent restrict the message.
 
 
 50
 Such a differential adverse impact upon a given viewpoint may suffice to trigger constitutional scrutiny. But viewpoint disparity, standing alone, does not constitute proof of viewpoint discrimination. See R.A.V. v. City of St. Paul, 505 U.S. 377, 385, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("We have long held, for example, that nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses — so that burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not." (citing cases)); Madsen v. Women's Health Ctr., 512 U.S. 753, 763, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) ("[T]he fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based."); cf. Bob Jones Univ., 461 U.S. at 604 n. 30, 103 S.Ct. 2017 ("[A] regulation does not violate the Establishment Clause merely because it happens to coincide or harmonize with the tenets of some or all religions." (internal quotation marks omitted)).
 
 
 51
 Where a law is on its face viewpoint neutral (e.g., when it applies to conduct that is not primarily expressive) but has a differential impact among viewpoints, the inquiry into whether the law is in fact viewpoint discriminatory turns on the law's purpose. Such a law is viewpoint discriminatory only if its purpose is to impose a differential adverse impact upon a viewpoint. See R.A.V., 505 U.S. at 390, 112 S.Ct. 2538 ("Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." (emphasis added)); Madsen, 512 U.S. at 762-63, 114 S.Ct. 2516 (holding that an injunction against anti-abortion protesters was not viewpoint discriminatory because "none of the restrictions imposed by the court were directed at the contents of petitioner's message." (emphasis added)); id. at 763, 114 S.Ct. 2516 ("We thus look to the government's purpose as the threshold consideration." (emphasis added)).
 
 
 52
 The BSA makes no argument that the purpose of Connecticut's Gay Rights Law was to impose a price on the expression of its point of view, rather than to protect persons from the more immediate economic and social harms of discrimination. Instead, its briefs to this court, as well as the briefs of its amici, simply assume that a law that has a differential adverse impact upon a viewpoint is necessarily viewpoint discriminatory.[7] The Supreme Court, however, in the cases just cited, has made clear that such inferences — from differential impact to motive, and thence to viewpoint discrimination — are not automatically to be drawn.
 
 
 53
 The Connecticut Supreme Court has stated that "[t]he Gay Rights Law was enacted in order to protect people from pervasive and invidious discrimination on the basis of sexual orientation." Gay & Lesbian Law Students Ass'n v. Bd. of Trs., 673 A.2d at 498; see also id. at 503 (Berdon, J., concurring) ("Gay men and lesbians have a right to be free from the discrimination and degrading homophobia that is prevalent in our society. [In passing the Gay Rights Law, the] legislature has adopted this public policy...."). We can find no reason to doubt the Connecticut Supreme Court's view of the matter and conclude that the purpose of Connecticut's Gay Rights Law is to discourage harmful conduct and not to suppress expressive association. We therefore hold that the law as enacted is viewpoint neutral.[8]
 
 
 54
 
 b) Was the defendants' application of Connecticut's Gay Rights Law viewpoint discriminatory?
 
 
 
 55
 While the BSA does not contend that the Connecticut legislature's purpose was to suppress expression, as such, when it enacted the Gay Rights Law, it does argue that in applying that law, the defendants singled the BSA out on the basis of its viewpoint. If the defendants in fact applied the Gay Rights Law in a viewpoint discriminatory manner, then the BSA would have a legitimate constitutional complaint. See Cornelius, 473 U.S. at 812, 105 S.Ct. 3439 (noting that the inconsistent application of a viewpoint-neutral law might be evidence of impermissible viewpoint discrimination); Finley, 524 U.S. at 587, 118 S.Ct. 2168 (suggesting that an as-applied challenge would lie where, in a particular funding decision, "the denial of a grant may be shown to be the product of invidious viewpoint discrimination").[9] The BSA makes two assertions in support of its claim that the defendants applied the Gay Rights Law in a viewpoint discriminatory manner.
 
 
 56
 First, the BSA argues that the procedures used to exclude it from the Campaign were irregular in a way that indicates that it was singled out for disfavored treatment. The BSA alleges that the following facts constitute evidence that it was improperly targeted: (1) the inquiry into the matter was initiated not by the Committee, but by the head of the CHRO; (2) the hearing on the matter was fast tracked, which the BSA reads as evidence that the CHRO wanted to reach a decision before the Supreme Court's ruling in Dale; (3) the April 27, 2000 hearing was "stacked" by inviting only groups opposed to the BSA's policies; (4) the CHRO's counsel consulted with the Gay & Lesbian Advocates & Defenders in framing both its May 12, 2000 and its February 8, 2001 rulings, while the BSA had no input; and (5) the Committee and the CHRO ignored pro-BSA precedent in framing the issue and in reaching their decision.
 
 
 57
 Second, the BSA argues that other organizations that served people of a particular sex, age, ethnicity, race and even sexual orientation were neither investigated nor excluded from the Campaign. From this, it draws the inference that it was targeted for its anti-homosexual message.[10]
 
 
 58
 The district court correctly held that the BSA's evidence of discrimination by the Committee and the CHRO is insufficient to survive summary judgment. The BSA's claims of biased procedure are purely speculative. The initiation of the inquiry by the head of the CHRO and the CHRO's contacts with anti-discrimination groups are evidence not of viewpoint discrimination, but of the CHRO's dual statutory role as both advocate and adjudicator. See Dep't of Health Servs. v. Comm'n on Human Rights and Opportunities ex rel. Mason, 198 Conn. 479, 503 A.2d 1151, 1156 (1986). The BSA has adduced no evidence that the hearing was fast-tracked because the defendants wanted to reach a decision before the Supreme Court issued a ruling in Dale — a ruling whose legal effect would not, in any event, depend on when the CHRO rendered its own ruling — rather than, as the defendants testified, to reach a decision before the start of the annual Campaign. Finally, the BSA's claim that the CHRO ignored controlling precedent that favored the BSA's position does no more than presume the correctness of the BSA's legal argument.
 
 
 59
 The BSA's second argument — that other groups that discriminate on bases other than the BSA were not excluded from the Campaign — raises a more serious issue. Evidence that the defendants, without legitimate reason,[11] discriminated between discriminators — selectively enforcing Connecticut's equal protection law only against anti-homosexual discrimination, and not against, for instance, anti-heterosexual discrimination — if adduced, might well be enough to preclude summary judgment for the defendants. The BSA, however, has presented no evidence that meets this description.
 
 
 60
 What the BSA gives us is a list of organizations that, by their names, would appear to target their services to persons of specific races, ethnicities, sexes, ages or sexual orientations. Despite being given ample opportunity to do so, however, the BSA presents no evidence that these groups actually have policies of discrimination or do discriminate in the provision of services. More significantly, the BSA fails to point to the slightest indication that these groups discriminate in their membership or employment policies, as opposed to their policies in providing services.[12] As the district court noted, 213 F.Supp.2d at 168, Connecticut has made a distinction between groups that discriminate in employment and membership policies and groups that discriminate in the provision of services. Connecticut has decided that discrimination of the former sort violates its equal protection law and that discrimination of the latter sort does not. Such a distinction is both reasonable and viewpoint neutral. We conclude that the BSA has presented no evidence that the defendants applied Connecticut's Gay Rights Law in a viewpoint discriminatory manner.
 
 2. Reasonableness
 
 61
 The remaining constitutional question is whether the removal of the BSA from the Campaign was reasonable. The Supreme Court has held that, so long as it is viewpoint neutral, a restriction in a nonpublic forum "need only be reasonable; it need not be the most reasonable or the only reasonable limitation." Cornelius, 473 U.S. at 808, 105 S.Ct. 3439 (emphasis in original); see also Pilsen Neighbors Cmty. Council v. Netsch, 960 F.2d 676, 686-87 (7th Cir.1992) (finding the legislative purpose to include only "popular" charities reasonable). The BSA argues, however, that the State of Connecticut's involvement in the Campaign is minimal and that it is "ludicrous" to think that "by permitting charities to participate in the Charitable Campaign, the State is made a party to the policies and actions of the individual charities." Appellant Br. at 37. We take this to be an argument that the BSA's exclusion from the Campaign, based as it was on such an allegedly trivial state interest, was not reasonable.
 
 
 62
 In its May 12, 2000 ruling, the CHRO concluded that the state was sufficiently involved in the Campaign to trigger the provisions of Connecticut law that prohibit state agencies from supporting organizations that discriminate on the basis of sexual orientation, Conn. Gen.Stat. §§ 46a-81i, 46a-81l, 46a-81n. CHRO Decl. Ruling of May 8, 2000 at 6-8. (In doing so, the CHRO relied in large part on Gay & Lesbian Law Students Ass'n v. Board of Trustees, 236 Conn. 453, 673 A.2d 484 (1996), in which the Connecticut Supreme Court held that the military's use of a state law school's on-campus employment recruiting facilities, of its other employment services and of its office of career services sufficed to trigger the protections of Connecticut's Gay Rights Law.) Given the level of participation of state agencies in the Campaign, we cannot say that the CHRO's interpretation of state law on this matter was unreasonable.[13]
 
 
 63
 Because the CHRO reasonably concluded that Connecticut's Gay Rights Law in fact required that the BSA be excluded from the Campaign, and given our conclusion that neither that law nor the defendants' reliance on it was a facade for impermissible viewpoint discrimination, it follows that the Committee's actions were a reasonable means of furthering Connecticut's legitimate interest in preventing conduct that discriminates on the basis of sexual orientation. Cf. Norwood v. Harrison, 413 U.S. 455, 463, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973) ("That the Constitution may compel toleration of private discrimination in some circumstances does not mean that it requires state support for such discrimination."). And we so hold.
 
 
 64
 Because the BSA has not presented any evidence of viewpoint discrimination, and because the defendants' removal of the BSA from the Campaign was reasonable, the district court was correct to grant the defendants' motion for summary judgment on the BSA's First Amendment claim.
 
 II. Connecticut State Law
 
 65
 The BSA also maintains that its exclusion from the Campaign violated the Connecticut Agency Regulations that govern the Campaign, as well as various provisions of Connecticut's Gay Rights Law. We consider each of its claims in turn.
 
 
 66
 The BSA argues that its exclusion violated the regulations governing the Campaign itself, which stipulate that organizations with "a stated policy of nondiscrimination" and "in compliance with all requirements of law and regulations respecting non-discrimination" are eligible to participate in the Campaign. Conn. Agencies Regs. § 5-262-3(k). Given our determination that the CHRO's decision that allowing the BSA to participate in the Campaign would violate Connecticut's Gay Rights Law was a correct and constitutional application of that law, this argument cannot succeed.
 
 
 67
 The BSA next argues that its exclusion from the Campaign violated a provision of the Gay Rights Law stating that that law shall not be construed "(1) to mean the state of Connecticut condones homosexuality or bisexuality or any equivalent lifestyle, [or] (2) to authorize the promotion of homosexuality or bisexuality in educational institutions or require the teaching in educational institutions of homosexuality or bisexuality as an acceptable lifestyle." Conn. Gen.Stat. § 46a-81r. The BSA argues that by including in the Campaign organizations that condone homosexual conduct, while excluding the BSA based on its contrary views, the defendants violated this provision. This argument, however, presumes that the BSA was excluded because of its views on homosexuality, rather than its conduct towards homosexuals, a proposition we have already rejected. Nor do we see how the inclusion of gay-rights groups in the Campaign qualifies as "condon[ing] homosexuality or bisexuality," as that term is used in (1).[14] Finally, the BSA can demonstrate neither that it is an "educational institution," as that term is used in (2), nor that it was in any way "required" to teach that homosexuality or bisexuality is an acceptable lifestyle.
 
 
 68
 Lastly, the BSA claims that the decision not to allow it to participate in the Campaign violates the provisions in the Gay Rights Law that prohibit the state from discriminating on the basis of sexual orientation in its provision of services and benefits, Conn. Gen.Stat. §§ 46a-81i, 46a-81n, where "sexual orientation" is defined to include "having a preference for heterosexuality... [or] having a history of such preference or being identified with such preference," Conn. Gen.Stat. § 46a-81a. But the suggestion that the BSA, which is neither a natural person nor an organization devoted to sexual activities, has a sexual orientation is contrary both to the common usage of the term and to the plain meaning of its statutory definition. Moreover, on the BSA's reading of "sexual orientation," any organization that discriminated on the basis of sexual orientation would itself have a sexual orientation and, therefore, its discrimination would be protected by the very laws that prohibit such discrimination. This is manifestly not the intended meaning of Connecticut's Gay Rights Law.
 
 CONCLUSION
 
 69
 Having found that the defendants' decision not to allow the BSA to participate in the Campaign violated neither the First Amendment nor Connecticut State law, we AFFIRM the judgment of the district court.
 
 
 
 Notes:
 
 
 [1]
 The district court's consideration of the claims arising under Connecticut law was based upon supplemental jurisdiction. 28 U.S.C. § 1367(a)
 
 
 [2]
 Other courts to consider these issues have come to various conclusions. At least two decisions have suggested that a homosexual's public activism is relevant to the question of whether the Boy Scouts may exclude himBoy Scouts of Am. v. D.C. Comm'n on Human Rights, 809 A.2d 1192, 1201-03 (D.C.2002) (holding that the Dale court "meant something of legal significance by coupling `avowed homosexual' with — or distinguishing it from — `gay activist'" and, before holding that the Boy Scouts could not be required to grant the complainants membership, finding that they were at least as "activist" as Dale); Chicago Area Council of Boy Scouts of Am. v. City of Chicago Comm'n on Human Relations, 322 Ill.App.3d 17, 255 Ill.Dec. 55, 748 N.E.2d 759, 767 (2001) (emphasizing that "[l]ike the complainant in Dale," the complainant in that case had publicly identified himself as a regional spokesperson for a gay rights organization). The Appellate Court of Illinois also adopted the narrow interpretation on the question of whether Dale applies to all membership and employment decisions or only to decisions about leadership positions. Chicago Area Council, 255 Ill.Dec. 55, 748 N.E.2d at 768-69 (remanding for determination of whether the Boy Scouts' "policies discriminated against [the complainant] based on his sexual orientation regarding nonexpressive positions that do not abridge Dale"). A Florida district court, however, seems to have adopted the broader reading of Dale on both counts. Boy Scouts of Am., S. Fla. Council v. Till, 136 F.Supp.2d 1295, 1308 (S.D.Fla.2001) (suggesting that the required inclusion of any homosexual, whether an activist or not, implicated the Boy Scouts expressive-associational rights under Dale).
 
 
 [3]
 While there is no obvious objective test forwhat message an organization intends to convey — a fact that recommends a certain amount of deference to the organization's statements on the matter — the CHRO argues that courts regularly tackle questions of the second sort — i.e., questions analogous to the issue of what effect on the Boy Scouts' message allowing a gay activist to occupy a leadership position within that organization would have. See, e.g., Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist. No. 3, 85 F.3d 839 (2d Cir.) (examining the positions in a student Christian organization from which non-Christians were excluded and concluding that it would adversely impact the organization's expression to require it to allow non-Christians to hold the offices of President, Vice-President and Music Coordinator, but not those of Activities Coordinator or Secretary, despite the complainants' assertion that a non-Christian in any leadership position would undermine the religious meaning of the meetings).
 
 
 [4]
 The CHRO's November 15, 2000 Declaratory Ruling went no further. It did not find that the BSA actually excluded homosexuals from non-leadership employment positions. Nor did it clearly rule on the question of whether the BSA's exclusion of avowed homosexuals as adult volunteer leaders violated Connecticut law. And it expressly did not reach the issue of whether the exclusion of youth members violated Connecticut law. CHRO Decl. Ruling of Nov. 15, 2000, at 7-10
 
 
 [5]
 The author of this opinion, speaking for himself alone, adds the following comments
 In the CHRO's February 8, 2001 decision that considered the effects of Dale on its earlier ruling that the BSA's participation in the Campaign violated Connecticut law, the CHRO concluded that Connecticut's compelling interest in the enforcement of its antidiscrimination statutes justified the limited burden that exclusion from the Campaign placed on the BSA's expressive association. CHRO Decl. Ruling of Feb. 8, 2001, at 16-18. It is possible that, under the Fourteenth Amendment, a state that has adopted a policy of equal protection with respect to a specific group may have a compelling interest in the enforcement of that policy, even if the federal government has not recognized that same group's claim to heightened scrutiny for the purposes of equal protection. Dale held that New Jersey's interest in enforcing its antidiscrimination laws was insufficient to justify that state's attempt to prohibit the BSA from engaging in the BSA's chosen form of expressive association. But that does not mean that, as to other state actions that are significantly less restrictive of associational freedoms, there might not be a state interest compelling enough to justify the restrictions. See Roberts v. United States Jaycees, 468 U.S. 609, 623, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) ("Infringements on [the freedom of association] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."); cf. Bob Jones Univ. v. United States, 461 U.S. 574, 604, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (holding that the governmental interest in eradicating racial discrimination was sufficiently compelling to justify withholding tax exempt status from a university on the basis of its religiously motivated racially discriminatory policies, despite the harm to the university's right to free exercise of religion). The defendants, however, do not press these arguments on appeal and we, therefore, need consider them no further.
 That said, the author of this opinion — perhaps because he is skeptical of, though bound to follow, the distinction between differential adverse impact and motive that has been made by the Supreme Court cases cited infra — sees in this unmade argument a potentially more convincing way to uphold limited state restrictions of the sort involved in this case.
 
 
 [6]
 We use the term "differential" to distinguish a law against littering, which has an adverse impact on speech but would not seem to affect one viewpoint over another, from a situation like the one before us in which the regulation, though aimed at conduct and not directed at a particular viewpoint, does have a predictably greater impact on some viewpoints rather than others. The impact could be termed "disparate," but we hesitate to use that word, as we do not wish to take a position one way or another on whether the treatment of "disparate impact" in other areas of the law,compare, e.g., Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (establishing disparate impact as a theory of liability under Title VII) with Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (holding that discriminatory purpose rather than disparate impact is the touchstone of an Equal Protection violation), have direct application here.
 
 
 [7]
 See, e.g., Appellant Br., at 36 ("After Dale, there can be no question that Boy Scouts' policy denying leadership to open homosexuals is part of Boy Scouts' expression and cannot be interfered with by state non-discrimination laws. To exclude Boy Scouts is viewpoint discrimination as a matter of law."); Amicus Br. of the American Civil Rights Union, at 12 ("Connecticut ... excluded the Boy Scouts from the ... Campaign... precisely because of the exercise by the Boy Scouts of the exact constitutional rights upheld by the U.S. Supreme Court in Dale. Consequently, the state has undeniably penalized the Boy Scouts for exercising these precise Constitutional rights." (footnote omitted)); Amicus Br. of the Pacific Legal Foundation, at 7 ("Connecticut has very clearly discriminated against the Boy Scouts `on the basis of viewpoint' by excluding them from a fund raising program available to other organizations with more acceptable viewpoints." (emphasis in the original)).
 
 
 [8]
 We recognize that the legislature's viewpoint-neutral purpose in passing a law that has a predictably adverse impact on certain viewpoints may be cold comfort to those whose expression the law, in practice, limits. But that is precisely the result that follows from the Supreme Court's treating more restrictive measures, like those considered inDale, differently from the lesser harm of removal from a nonpublic forum, like that at stake in the instant case. Connecticut has not prevented the BSA from exercising its First Amendment rights; it has instead set up a regulatory scheme to achieve constitutionally valid ends under which, as it happens, the BSA pays a price for doing so.
 
 
 [9]
 The CHRO argues that underCornelius the only issue is "whether the regulation itself — not its application to a particular party — was a `facade' for viewpoint-based discrimination." CHRO Brief at 34. We decline to adopt so narrow a reading either of the nonpublic-forum or of the unconstitutional-conditions cases, and believe that the application of a viewpoint neutral rule in a viewpoint discriminatory manner violates the First Amendment.
 
 
 [10]
 The BSA lists the following organizations that, it claims, "serve preferentially or exclusively persons of a particular race, color, religious creed, sex, age, national origin, or ancestry" and were allowed to participate in the Campaign: the Girl Scout Council of Southwestern Connecticut, Lambda Legal Defense and Education Fund, the Hartford Gay and Lesbian Health Collective, the Stonewall Foundation, Padres Abriendo Puertas, the NAACP Legal Defense and Educational Fund, Casa Boricua de Meriden, the Hispanic Health Council, Inc., Casa Otonal, Nutmeg Big Brothers/Big Sisters, Inc., Boys and Girls Club of Hartford, Inc., United Seniors in Action, Services for the Elderly of Farmington, Inc., Catholics for a Free Choice, the Greater Hartford Jewish Community Center, Inc., the National Black Child Development Institute, and the Hispanic Scholarship Fund. Appellant Br., at 14-15
 
 
 [11]
 A legitimate, viewpoint-neutral reason might include the state's finding that discriminatory conduct against one group was more pernicious, for historical or other reasons, than discriminatory conduct against another group
 
 
 [12]
 At oral argument, the BSA asked that we take judicial notice of the fact that the Girl Scouts of America admits only girls as members. Whether or not this is so, the youth membership policies of organizations whose mission is to serve young people are not comparable to a group's adult membership or employment policies. Such youth membership policies are more like the targeted provision of servicesCf. 20 U.S.C. § 1681(a)(6)-(8) (exempting certain youth-membership organizations from the prohibition on gender discrimination in educational programs receiving federal financial assistance). Connecticut seems to have recognized this distinction, for the CHRO declined to rule on whether the BSA's own discriminatory youth membership policies violated Connecticut's Gay Rights Law. CHRO Decl. Ruling of Nov. 15, 2000, at 10.
 
 
 [13]
 The CHRO is "charged with the primary responsibility of determining whether discriminatory practices have occurred and what the appropriate remedy for such discrimination must be."Dept. of Health Servs., 503 A.2d at 1156. Under Connecticut law, where, as here, statutes have received some judicial application, "an agency's construction of the statutes entrusted to it for enforcement is generally persuasive, even if it is not dispositive." Altray Co., Inc. v. Groppo, 224 Conn. 426, 619 A.2d 443, 448 (1993); see also Gay & Lesbian Law Students Assoc. v. Bd. of Trustees, 236 Conn. 453, 673 A.2d 484 (1996) (interpreting Connecticut's Gay Rights Law).
 
 
 [14]
 This is quite apart from whether clause (1) means toprohibit anything, or is simply a statement that passage of the Gay Rights Law should not be read as a legislative approval of particular lifestyles.